# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| WILLIAM A. LONG, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 15-00605 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 16, 18 |
| | : | | |
| DISTRICT OF COLUMBIA HOUSING | : | | |
| AUTHORITY, *et al.* | : | | |
| | : | | |
| Defendants. | : | | |

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff William A. Long brought this action against Defendants the District of

Columbia Housing Authority ("DCHA") and Adrianne Todman in her official capacity as

DCHA's Executive Director under 42 U.S.C. § 1983, the Housing Act of 1937, 42 U.S.C. §§

1437 *et seq.*, as amended by the Quality Housing and Work Responsibility Act of 1998, 42

U.S.C. §§ 13661 *et seq.*, the Fifth Amendment to the U.S. Constitution, and District of Columbia

Municipal Regulations challenging DCHA's termination of his housing assistance payments as

part of the Housing Choice Voucher Program, a federally-funded program that DCHA

administers.

The parties have filed cross-motions for summary judgment based on the undisputed facts

of the case.  *See* Defs.' Mot. Summ. J., ECF No. 16; Pl.'s Cross-Mot. Summ. J. & Opp'n Defs.'

Mot. Summ. J. ("Pl.'s Mot. Summ. J."), ECF No. 18.  For the reasons provided below, the Court

will enter judgment in favor of Defendants as to Counts II, III, and IV of Mr. Long's Complaint

and deny the parties' motions as to Counts I and V without prejudice in order to permit the

parties to more fully brief the underlying legal issues.

## II.  BACKGROUND

This case involves the relationships between a federal statute, its implementing

regulations, and local District of Columbia regulations.  It is therefore necessary for the Court to

first provide an overview of the relevant statutory and regulatory framework before turning to the

factual background and procedural history of this case.

### A.  Statutory and Regulatory Framework

The Housing Choice Voucher Program (the "Program," also commonly referred to as

"Section 8" or the "HCVP") was created by Congress with "the purpose of aiding low-income

families in obtaining a decent place to live and of promoting economically mixed housing" by

providing low-income families with assistance payments, or subsidies, to enable them to rent

units in the private rental housing market.  42 U.S.C. § 1437f(a).  The program is financed by the

federal government, regulated by the Department of Housing and Urban Development ("HUD"),

and administered by state and local public housing agencies ("PHAs").  *See* 42 U.S.C. § 1437f;

*Simmons v. Drew*, 716 F.2d 1160, 1161 (7th Cir. 1983).  Through the Program, HUD distributes

federal funds to PHAs, and the PHAs, in turn, distribute the funds by contracting with property

owners to subsidize a portion of a Program participant's rent.  *See* 42 U.S.C. § 1437f; *Simmons*,

716 F.2d at 1161.  DCHA, an agency of the District of Columbia government, is the PHA

responsible for administering the Program in the District of Columbia.  *See* D.C. Code § 6-202;

14 D.C.M.R. § 4900.

1. Statutory Provisions Concerning Admission and Termination

In order to participate in the Program and receive assistance, a family must first apply to a PHA for admission to the Program and be admitted.  In 1998, Congress enacted the Quality Housing and Work Responsibility Act (the "QHWRA"), which amended the Housing Act to, among other things, authorize and, in some cases, require, PHAs and owners to deny admission to certain categories of applicants and terminate certain participants' assistance.  *See* 42 U.S.C. §§ 13661–13664.

Specifically, and most relevant in this case, § 13663, titled "Ineligibility of dangerous sex offenders for admission to public housing," provides that owners of federally assisted housing must "prohibit admission to such housing for any household that includes any individual who is subject to a lifetime registration requirement under a State sex offender registration program." 42 U.S.C. § 13663(a).  Section 13663 also, among other things, instructs PHAs to conduct criminal history background checks to determine whether an applicant is subject to a lifetime registration requirement, authorizes PHAs to conduct background checks with respect to applicants and tenants at the request of owners, and provides applicants with an opportunity to dispute the factual determination of their status as a lifetime registrant prior to any adverse action.  *See* 42 U.S.C. § 13663(b)–(d).

The statute provides other mandatory and discretionary grounds for denying admission to applicants.  Specifically, § 13661, a companion provision, addresses illegal drug users, alcohol abusers, and other criminals.  *See* 42 U.S.C. § 13661.  It provides, for example, that any tenant who has been evicted from federally assisted housing for drug-related criminal activity "shall not be eligible for federally assisted housing" for the three years following the tenant's eviction, unless the tenant successfully completes a rehabilitation program.  42 U.S.C. § 13661(a).  It also

requires the establishment of standards to prohibit admission to anyone determined to be "illegally using a controlled substance" or whose "illegal use (or pattern of illegal use) of a controlled substance, or abuse (or pattern of abuse) of alcohol, may interfere with the health, safety, or right to peaceful enjoyment of the premises by other residents." 42 U.S.C. § 13661(b).

Importantly, §§ 13661 and 13663 concern grounds for denying admission to the Program; these sections of the statute do not, at least explicitly, concern a PHA's termination of a participant in the Program who has already been admitted and has been receiving assistance. Termination is addressed separately in the section that falls between them. *See* 42 U.S.C. § 13662. Section 13662, titled "Termination of tenancy and assistance for illegal drug users and alcohol abusers in federally assisted housing" authorizes PHAs and owners to terminate the tenancy or assistance of a participant family on the same grounds that § 13661(b) provides for denying admission: if a member is determined to be "illegally using a controlled substance" or whose "illegal use (or pattern of illegal use) of a controlled substance, or whose abuse (or pattern of abuse) of alcohol" interferes with the right to peaceful enjoyment by other residents. 42 U.S.C. § 13662(a). It also provides that, in determining whether to terminate tenancy or assistance, a PHA or owner may consider whether the household member has been rehabilitated. *See* 42 U.S.C. § 13662(b). Neither § 13662 nor any other provision of the statute specifically addresses termination of assistance due to a participant's status as a lifetime registrant.

The statute also instructs HUD to require PHAs to establish an administrative grievance procedure that provides a process for taking adverse actions against tenants in which tenants will, among other things, "be advised of the specific grounds" of the proposed adverse action, have an opportunity to contest the adverse action before an impartial party, and "receive a written decision by the public housing agency on the proposed action." 42 U.S.C. § 1437d(k).

2.  HUD Regulations

HUD's relevant implementing regulations are codified at 24 C.F.R. pt. 982.  Under these regulations, PHAs are required to adopt a written administrative plan "that establishes local policies for administration of the program in accordance with HUD requirements" and "states PHA policy on matters for which the PHA has discretion to establish local policies."  24 C.F.R. § 982.54(a).  PHAs are required to "revise the administrative plan if needed to comply with HUD requirements."  24 C.F.R. § 982.54(b).  PHAs are also required to "comply with HUD regulations and other HUD requirements for the program" and the regulation states that "HUD requirements are issued by HUD headquarters, as regulations, Federal Register notices or other binding program directives."  24 C.F.R. § 982.52(a).  The regulation does not define the phrase "other binding program directives."

On May 24, 2001, HUD promulgated regulations that implemented the QHWRA, codified, in relevant part, at 24 C.F.R. §§ 982.551–.555, which became effective on June 25, 2001.  *See* 66 Fed. Reg. 28,776 (May 24, 2001).  The regulations provide certain obligations for Program participants (§ 982.551), specify mandatory and discretionary grounds for PHAs to deny admission to applicants or terminate assistance to participants (§ 982.552), and specify other mandatory and discretionary grounds for PHAs to deny admission and terminate assistance to criminals and alcohol abusers (§ 982.553).  Like the statute it implements, the HUD regulations only address lifetime registrants with respect to denying admission to applicants.  Subsection 982.553(a), titled "Denial of admission," provides, in relevant part:

> The PHA *must* establish standards that prohibit admission to the program if any member of the household is subject to a lifetime registration requirement under a State sex offender registration program.  In this screening of applicants, the PHA must perform criminal history background checks necessary to determine whether any household member is subject to a lifetime sex offender

> registration requirement in the State where the housing is located
> and in other States where the household members are known to have
> resided.

24 C.F.R. § 982.553(a)(2)(i) (emphasis in original).  The subsection that follows, § 982.553(b),

titled "Terminating assistance," requires PHAs to establish standards to terminate assistance to

drug criminals, families in breach of the obligation set forth in § 982.551 to not engage in drug-

related criminal activity, and alcohol abusers.  *See* 24 C.F.R. § 982.553(b).

 HUD regulations also set certain procedural requirements for denying admission and

terminating assistance.  PHAs must give applicants prompt notice of a decision to deny

admission and an informal review process to contest the decision.  *See* 24 C.F.R. § 982.554.

PHAs are also required to give participant families an opportunity for an informal hearing if,

among other things, the PHA decides to terminate assistance "because of the family's action or

failure to act."  24 C.F.R. § 982.555(a)(iv).  The person conducting the hearing must "issue a

written decision, stating briefly the reasons for the decision."  24 C.F.R. § 982.555(e)(6).  The

regulation also provides, however:  "The PHA is not bound by a hearing decision . . .

[c]oncerning a matter for which the PHA is not required to provide an opportunity for an

informal hearing under this section, or that otherwise exceeds the authority of the person

conducting the hearing under the PHA hearing procedures" or that is "[c]ontrary to HUD

regulations or requirements, or otherwise contrary to federal, State, or local law."  24 C.F.R. §

982.555(f).  The regulation specifies that "[i]f the PHA determines that it is not bound by a

hearing decision, the PHA must promptly notify the family of the determination, and of the

reasons for the determination."  24 C.F.R. § 982.555(f)(3).

### 3.  Subsequent HUD Opinion Letter and Notices

Since promulgating the regulations concerning denial of admission and termination of

assistance, HUD has issued at least one opinion letter and has publicly issued "notices"

addressing the statutory and regulatory requirements concerning lifetime registrants.

First, on December 21, 2007, HUD responded to a request by The Legal Aid Society in

New York regarding the applicability of § 13663 "to a public housing tenant who was classified

as a sex offender by a New York State court 4 years after his tenancy began."  Pl.'s Ex. 7 at 55–

56, ECF No. 18-1.[1]  In this letter, HUD wrote, in relevant part:

> It is clear from [§ 13663] and 24 C.F.R. § 982.553(b[)](2)(i) that the
> bar against sex offenders subject to lifetime registration
> requirements applies only to "applicants" seeking "admission" to a
> federally assisted housing program.  Thus, the statute has no
> applicability to an individual who has already been admitted to
> public housing under the circumstances described in your letter.

*Id.* at 56.

Then, on September 9, 2009, HUD publicly issued Notice PIH 2009-35(HA) in order "to

reiterate current regulatory requirements and strongly encourage the establishment of standards

and procedures with a zero tolerance approach to prevent lifetime sex offenders from receiving

federal housing assistance."  HUD Notice PIH 2009-35(HA) (the "2009 Notice"), Pl.'s Ex. 7 at

51–54.  In this notice, HUD stated that it was "currently exploring regulatory and legislative

changes to ensure that individuals subject to lifetime registration requirements do not continue to

reside in federally assisted housing, but the strong recommendations in this Notice are vital to the

---

[1]     Mr. Long and Defendants both filed all of the exhibits to their respective motions for
summary judgment as a single attachment on the Court's ECF system.  *See* ECF No. 16-1; ECF
No. 18-1.  The Court's citations in this Memorandum Opinion to the parties' exhibits reference
the page numbers of the attachment file, rather than the page number of the particular exhibit or
document.  For ease of reference, the Court encourages the parties to file future exhibits as
separate attachments on the Court's ECF system.

ongoing effort to ensure the highest levels of public safety in federally assisted housing facilities." *Id.* at 51.  The 2009 Notice's summary of the relevant statutory and regulatory requirements discussed owners' and PHAs' obligations to deny admission to lifetime registrants and did not address termination of assistance.  The 2009 Notice recommended, however, that if, during the annual recertification process, an owner or PHA discovers that a tenant or a member of the tenant's household is a lifetime registrant, the owner or PHA "should pursue eviction or termination of tenancy to the extent allowed by their lease and state or local law." *Id.* at 54.  The 2009 Notice expired, by its own terms, on September 30, 2010.  *See id.* at 51.

On June 11, 2012, HUD publicly issued Notice PIH 2012-28, which superseded the 2009 Notice.  *See* HUD Notice PIH 2012-28 (the "2012 Notice"), Defs.' Ex. 3, ECF No. 16-1.  In this notice, HUD changed its position regarding the termination of lifetime registrants under the statute and HUD regulations:

> This guidance reiterates owners' and agents' (O/As) and Public Housing Agencies' (PHAs) statutory- and regulatory-based responsibilities to prohibit admission to individuals subject to a lifetime registration requirement under a State sex offender registration program.  If a participant who is subject to such a lifetime registration requirement was erroneously admitted into a federal housing program . . . and is found to be receiving assistance, O/As and PHAs *must pursue eviction or termination of assistance for these participants*.

*Id.* at 12 (emphasis added).  The 2012 Notice further stated, under a section titled "Statutory and Regulatory Clarifications":

> [I]f an O/A or PHA discovers that a household member was erroneously admitted (the household member was subject to a lifetime registration requirement at admission and was admitted after June 25, 2001), the O/A or PHA *must immediately pursue eviction or termination of assistance for the household member*. Regulations for hearings for the Public Housing (PH) and Housing Choice Voucher (HCV) programs, at 24 CFR § 966 Subpart B and § 982.555, respectively, continue to apply.

*Id.* at 13.  The 2012 Notice also stated:  "For admission before June 25, 2001, there is currently no HUD statutory or regulatory basis to evict or terminate the assistance of the household solely on the basis of a household member's sex offender registration status."  *Id.* at 14.

### 4. District of Columbia Municipal Regulations

Unlike some other PHAs, DCHA's administrative plan is enacted through the District of Columbia's regulations governing the Program.  *See generally* D.C. Code § 6-203; D.C. Mun. Regs. tit. 14, chs. 49–59.

On September 20, 2013, the Board of Commissioners of DCHA added, following a notice and comment period that began on May 9, 2013, § 5804 to Title 14 of the D.C. Municipal Regulations.  Section 5804 is titled "Termination of Participation and Assistance for Criminal Activity" and sets forth mandatory and discretionary grounds for DCHA to terminate a family's assistance.  *See* 14 D.C.M.R. § 5804.  It states, in relevant part:  "DCHA shall terminate participation of a Family if . . . (b) Any member of the household is subject to a lifetime registration requirement under a state or District of Columbia sex offender program."  14 D.C.M.R. § 5804.1.

## B.  Factual Background

The facts of this case are undisputed.  *See* Pl.'s Mot. Summ. J. at 2 ("Plaintiff does not find any genuine issue exists with the facts as provided in Defendants' motion."); Defs.' Response Pl.'s Stmt. Material Facts, ECF No. 21-1.

In 1991, Mr. Long was convicted of rape in the District of Columbia, and, under D.C.'s sex offender registration law, D.C. Code §§ 22-4001(6), 22-4002(b), he is subject to a lifetime registration requirement.  *See* Defs.' Stmt. Facts ¶ 1, Defs.' Mot. Summ. J. at 4–6 ("Defs.' SOF"); Defs.' Ex. 1, ECF No. 16-1; Pl.'s Stmt. Material Facts ¶ 5, Pl.'s Mot. Summ. J. at 10–16

("Pl.'s SOF"); Decl. William A. Long ¶ 5 ("Long Decl."), ECF No. 2-2.[2]  On December 29,

1999, Mr. Long was released from prison on parole, and, in accordance with the law, registered

as a sex offender in the District of Columbia on December 5, 2000.  *See* Defs.' Ex. 1; Long Decl.

¶¶ 6–7.

On December 17, 2001, nearly six months after HUD's regulation concerning the

admission of lifetime registrants to the Program became effective, Mr. Long submitted an

application to participate in the Program.  *See* Long Decl. ¶ 8.  In submitting this application, Mr.

Long completed all of the required documentation at the time and provided all of the information

requested by both DCHA and Community Family Life Services, the organization that manages

Milestone Place, the property in which Mr. Long resides.  *See* Pl.'s SOF ¶ 7; Long Decl. ¶ 10.

Mr. Long did nothing to conceal his status as a lifetime sex offender registrant, but it appears that

the application did not ask Mr. Long to provide any information concerning his criminal history.

*See* Pl.'s SOF ¶ 7; Long Decl. ¶ 10 ("I did not hide the fact that I am subject to a lifetime

registration requirement."); Defs.' Ex. 2 at 6 (June 2007 informal hearing decision stating, "No

where [sic] on the application is there a request for the applicant to provide information related to

past criminal history").  Despite his status as a lifetime registrant, DCHA admitted him to the

Program in 2002 as a resident of Milestone Place.  *See* Defs.' SOF ¶ 6; Pl.'s SOF ¶ 6; Long Decl.

¶ 9.

---

[2]      In his motion for summary judgment, Mr. Long refers to his own declaration without
citing an exhibit number or a docket number on the Court's ECF system.  *See, e.g.,* Pl.'s SOF ¶
1.  Mr. Long did not file a declaration in connection with his motion for summary judgment, and
the only declaration that the Court can locate is a declaration that he filed in connection with his
previously withdrawn motion for a preliminary injunction.  *See* Long Decl.  The paragraphs of
this declaration do not correspond to the paragraphs cited in Mr. Long's motion for summary
judgment.  *Compare, e.g.,* Pl.'s SOF ¶ 5 (citing ¶ 2 of the declaration regarding Mr. Long's
health issues) *with* Long Decl. ¶ 3 (addressing health issues).  Nevertheless, the Court finds this
previously-filed declaration helpful in its summation of the undisputed record.

Though DCHA did not request information concerning Mr. Long's criminal history as part of his initial application for admission to the Program, DCHA requested criminal history information during its regular recertification application process. *See* Pl.'s Ex. 3 (Mr. Long's recertification applications for 2010–2011 and 2012–2013). Whenever the information has been requested, Mr. Long has truthfully disclosed his status as a lifetime sex offender registrant. *See, e.g., id.* at 15. Despite these disclosures and even notwithstanding DCHA's attempts to terminate Mr. Long's participation, DCHA has inexplicably continued to recertify Mr. Long's eligibility for the Program, most recently on January 30, 2015. *See* Pl.'s SOF ¶ 7; *see, e.g.,* Pl.'s Ex. 3 at 7 (recertification dated February 27, 2013); Pl.'s Ex. 6 at 44 (recertification dated January 30, 2015).

Mr. Long has remained a resident of Milestone Place since his initial admission to the Program. He is "significantly disabled," currently receives Social Security Disability Insurance, and suffers from end-stage kidney disease, which requires dialysis treatment several times per week. *See* Pl.'s SOF ¶ 1.

### C. Administrative Proceedings and the Present Action

DCHA has twice attempted to terminate Mr. Long's assistance and participation in the Program.

#### 1. First Informal Hearing in 2007

DCHA first attempted to terminate Mr. Long's assistance in 2007 but was unsuccessful. On March 23, 2007, DCHA notified Mr. Long that a compliance investigator had recommended that Mr. Long be terminated from the Program for failing to comply with his "family obligations," and, specifically, being in violation of 24 C.F.R. § 982.553(a)(2)(i), which, as discussed, *supra*, provides that PHAs must establish standards to "prohibit admission" to lifetime

registrants.  *See* Defs.' Ex. 2 at 6 (Informal Hearing Decision dated June 11, 2007).  An informal

hearing was held on May 4, 2007, and the hearing officer defined the issue presented as follows:

"Whether the recommendation to terminate [Mr. Long] from the [Program] for violation of [24]

C.F.R. § 982.553(a)(2)(i) is justified and supported by the facts."  *Id.* at 5.

In a decision dated June 8, 2007, the hearing officer denied the recommendation for

termination.  *See id.* at 9.  In making this determination, the hearing officer reasoned that while §

982.553(a)(2)(i) provided grounds to "prohibit admission," he was "simply not convinced" that it

could "be used to 'evict' an existing tenant from the program" and that "[t]he Regulations,

frankly, do not address the current circumstance." [3]  *Id.* at 7.  The hearing officer concluded:

> In my opinion, and under the circumstances, it would be a travesty
> to terminate [Mr. Long] from the Program without a more
> substantive showing that justifies otherwise.  Simply relying on a
> provision that should have been utilized at the initial application
> stage six years ago, does not provide sufficient reasonable cause to
> evict [Mr. Long] at this time.

*Id.* at 9.  DCHA did not appeal the hearing officer's decision, and Mr. Long remained a

participant in the Program.

## 2.  Second Informal Hearing and Final Decision in 2014

On June 19, 2014, after HUD had issued the 2012 Notice and DCHA had promulgated 14

D.C.M.R. § 5804, DCHA notified Mr. Long that he was again being recommended for

termination "[a]s a result of [his] failure to comply with certain Family Obligations under the

Housing Choice Voucher Program."  Defs.' Ex. 4 at 18.  This notice referenced and quoted 14

---

[3]      The hearing officer also interpreted the regulations to provide for exceptions to the
mandatory ban against lifetime sex offender registrants and opined that "in all likelihood" Mr.
Long would have been admitted to the Program even if DCHA had properly screened him in the
initial application process.  Defs.' Ex. 2 at 8.  The Court does not endorse this interpretation, and,
given that the parties do not address this issue in their briefs, need not offer further comment.

D.C.M.R. § 5804.1(b) as the legal basis for his termination and stated that Mr. Long had

registered as a sex offender in December 2000.  *See id.*

     An informal hearing on DCHA's termination recommendation was held on September

19, 2014.  *See* Defs.' Ex. 5 at 20–24 (Informal Hearing Decision dated Sept. 30, 2014).  DCHA

argued that 14 D.C.M.R. § 5804.1(b) provided it with grounds to terminate Mr. Long and also

"relie[d] on HUD Notice PIH 2012-28."  *Id.* at 21.  Mr. Long was represented at the hearing by

counsel.  *See id.* at 20.  He gave testimony on his own behalf, and several of his family members

testified concerning his poor health.  *See id.* at 21; *id.* at 22 ("Testimony was presented by his

sister, brother, and cousin of his condition and his inability to care for himself.").

     In an informal hearing decision dated September 30, 2014, the hearing officer denied the

recommendation for termination.  *See id.* at 23.  The hearing officer began his analysis by

stating:

> Initially, I do not believe that, under the U.S. Constitution, DCHA
> can "grandfather" a crime that was committed in 1991, and a
> subsequent registration as a sex offender in 2000, as a violation of a
> regulation, ex post facto, that was passed in 2012.  The HUD Notice
> does not have the force and effect of a law, given that it was not
> published for public comment or passed by Congress.

*Id.* at 22.  He further stated that Mr. Long disclosed his status as a registered sex offender when

he initially applied for housing assistance in 2001[4] and had continued to disclose his status in

recertification applications and, as a result, "the only reasonable conclusion is that DCHA

admitted him with full knowledge of his status."  *Id.*  The hearing officer also found that "[t]he

doctrines of res judicata and collateral estoppel are applicable" due to the previous hearing

---

[4]     Though the Court notes a potential conflict between this finding and the hearing officer's finding in 2007 that "[n]o where on the application is there a request for the applicant to provide information related to past criminal history," Defs.' Ex. 2 at 6, the parties do not argue that this potential conflict has any relevance here.

officer's informal decision in 2007 and that "the passing of a new regulation in 2012" did not

alter his conclusion.  *Id.*  Finally, the hearing officer also stated that "it appears from the

evidence that there is little danger of [Mr. Long] posing a threat," particularly given his "serious

medical condition," and that "[i]f [Mr. Long's] condition changes or if he poses a threat in the

future, then DCHA has sufficient regulatory authority to seek to terminate him at that time."  *Id.*

DCHA appealed the decision to DCHA's Executive Director, Ms. Todman, pursuant to

14 D.C.M.R. § 8905.4(b).[5]  *See* Defs.' SOF ¶ 12; Pl.'s SOF ¶ 18.  On December 15, 2014, Ms.

Todman issued a final decision in which she reversed the hearing officer's decision.  *See* Defs.'

Ex. 6 at 26–27 (Final Information Hearing Decision of DCHA dated Dec. 15, 2014).  In her

written decision, Ms. Todman reasoned as follows:

> Complainant was recommended for termination from the Housing
> Choice Voucher Program ("HCVP") for violating 14 D.C.M.R. §
> 5804.1(b) – DCHA shall terminate participation of a family if…any
> member of the household is subject to a lifetime registration
> requirement under a state or District of Columbia sex offender
> program.   The Hearing Officer made an error of law by
> misinterpreting the U.S. Constitution.  The Hearing Officer referred
> to the relevant regulation as ex post facto, typically used to refer to
> a criminal law that applies retroactively.  The Proposed Decision is
> hereby REVERSED.

*Id.* at 26 (punctuation in original).

### D.  Current Status

By letter dated December 31, 2014, DCHA informed Community Family Life Services

that Mr. Long's assistance had been terminated and that, effective January 31, 2015, all

assistance payments for Mr. Long would cease.  *See* Pl.'s Ex. 11 at 72.  Nevertheless, DCHA

inexplicably recertified Mr. Long for the Program on January 30, 2015.  *See* Pl.'s Ex. 6 at 44.

---

[5]      Ms. Todman's final informal decision erroneously states that it was Mr. Long who
requested reconsideration.  *See* Defs.' Ex. 6 at 26.

It is undisputed that without rental assistance payments, Mr. Long will be unable to afford the monthly rent for his current home or locate alternate affordable housing.  *See* Pl.'s SOF ¶ 22.  Although Community Family Life Services submitted a letter in support of Mr. Long during the informal hearing process stating that "it would be extremely detrimental to his physical and emotional well-being" if Mr. Long lost his housing, Pl.'s Ex. 2 at 5, it is also undisputed that Mr. Long would necessarily be evicted from the property if his assistance payments are terminated, *see* Pl.'s SOF ¶ 22.

Mr. Long filed this action on April 22, 2015.  *See* Compl., ECF No. 1.  DCHA subsequently agreed to continue making assistance payments while this action remains pending.  *See* Defs.' Mot. Summ. J. at 6 n.1.

## III.  LEGAL STANDARD

Both parties have moved for summary judgment on all counts of Mr. Long's Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate."  *Wyo. Outdoor Council v. Dombeck*, 148 F. Supp. 2d 1, 7 (D.D.C. 2001) (citing *Crain v. Bd. of Police Comm'rs*, 920 F.2d 1402, 1405–06 (8th Cir. 1990)).  Here, Mr. Long has not disputed Defendants' proffered facts, and Defendants have not disputed Mr. Long's proffered facts.  Therefore, this case can be decided on summary judgment.

# IV.  ANALYSIS

Mr. Long brings five separate claims against Defendants for various constitutional and statutory violations, at least three of which are brought under 42 U.S.C. § 1983.[6]  *See* Compl. at 7–9.  Count I is brought under § 1983 for terminating his rental assistance under the Program in violation of 42 U.S.C. §§ 13662 and 13663(a) and 24 C.F.R. §§ 5.856, 960.204(a) and 982.553(a)(2).  *See id.* at 8.  Count II is brought under § 1983 for terminating his rental assistance without adequate procedural due process in violation of the Fifth Amendment to the U.S. Constitution.  *See id.*  Count III is brought under § 1983 for providing him with inadequate notice of the reasons for his termination in advance of his informal hearing in violation of 42 U.S.C. § 1437d(k) and 24 C.F.R. § 982.555(c)(2).  *See id.* at 8–9.  Count IV, which does not reference any particular cause of action, claims that, under the doctrines of collateral estoppel and *res judicata*, the informal hearing officer's prior decision in 2007 prevents Defendants from terminating his assistance.  *See id.* at 9.  And finally, Count V claims that Defendants violated 14 D.C.M.R. § 5804.4 by failing to show by a preponderance of the evidence that he had violated one of his obligations.  *See id.*

The Court addresses each count in turn.

---

[6]     Mr. Long's Complaint actually alleges *violations* of § 1983.  *See, e.g.,* Compl. at 8 (alleging that Defendants are depriving him of a property interest "in violation of . . . 42 U.S.C. § 1983"); *id.* at 9 (alleging that Defendants terminated him without proper notice "in violation of . . . 42 U.S.C. [§] 1983").  But "one cannot go into court and claim a 'violation of § 1983'—for § 1983 by itself does not protect anyone against anything."  *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979).  Rather, as the Court explains, *infra*, § 1983 simply provides a remedy for violations of rights secured by the U.S. Constitution and federal laws.  The Court therefore reads the Complaint as bringing claims under § 1983 for alleged violations of constitutional and statutory rights.

**A.  Count I:  Section 1983 Claim for Termination in Violation of Federal Law**

In Count I, Mr. Long brings a claim against Defendants under 42 U.S.C. § 1983 for

terminating his assistance in violation of the Housing Act and HUD's implementing regulations.

Specifically, Mr. Long argues that the provisions of the statute and its regulations that address

lifetime registrants and termination of assistance do not provide Defendants with the authority to

terminate his assistance on the basis of his status as a lifetime registrant and that 14 D.C.M.R. §

5804.1(b) is "illegal and void" because it is contrary to federal law.  Compl. at 7–8.  This

argument is, as the parties acknowledge, the central issue in this case.  But before the Court can

consider the merits of Mr. Long's argument, the Court must first determine whether § 1983

provides him with the ability to raise it.  As explained below, the Court finds that the parties have

not sufficiently addressed this crucial, threshold issue in their summary judgment briefing and

that additional briefing is needed in order for the Court to properly resolve it.

### 1.  Rights Enforceable Under § 1983

Section 1983 creates a remedy for the deprivation of "rights, privileges, or immunities

secured by the Constitution and laws" of the United States.  42 U.S.C. § 1983; *see also Gonzaga

Univ. v. Doe*, 536 U.S. 273, 283 (2002).  "In order to seek redress through § 1983 . . . a plaintiff

must assert the violation of a federal *right*, not merely a violation of federal *law*."  *Blessing v.

Freestone*, 520 U.S. 329, 340 (1997) (citing *Golden State Transit Corp. v. Los Angeles*, 493 U.S.

103, 106 (1980)); *see also Gonzaga*, 536 U.S. at 283 ("[I]t is *rights*, not the broader or vaguer

'benefits' or 'interests,' that may be enforced under the authority of that section.").  Section 1983

permits private individuals to bring lawsuits to enforce not only constitutional rights, but also

rights created by federal statutes.  *See Maine v. Thiboutot*, 448 U.S. 1, 4–5 (1980).  Section 1983,

however, does not itself create any substantive rights, but, rather, it "merely provides a

mechanism for enforcing individual rights 'secured' elsewhere, *i.e.,* rights independently 'secured by the Constitution and laws' of the United States." *Gonzaga*, 536 U.S. at 285. Thus, in order to bring a § 1983 claim for a violation of a federal right not secured by the Constitution, a plaintiff must identify a violation of a substantive right that has been created by a federal statute.

In *Blessing,* the Supreme Court identified three "factors" to guide courts in determining whether a federal statute gives rise to a federal right: first, "Congress must have intended that the provision in question benefit the plaintiff"; second, "the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial competence"; and third, "the statute must unambiguously impose a binding obligation on the States," or, "[i]n other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms." *Blessing*, 520 U.S. at 340–41. Since *Blessing*, however, "[t]he Court's approach to § 1983 enforcement of federal statutes has been increasingly restrictive; in the end, very few statutes are held to confer rights enforceable under § 1983." *Johnson v. Housing Auth. of Jefferson Parish*, 442 F.3d 356, 360 (5th Cir. 2006); *see also* 13D Charles Alan Wright & Arthur R. Miller, Fed. Practice & Procedure § 3573.2 (3d ed. 2015) ("The Court has narrowed its view of what 'laws' may be invoked under § 1983.").

In *Gonzaga*, the Court "reject[ed] the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action under § 1983." *Gonzaga*, 536 U.S. at 283. The Court stated that "[f]or a statute to create such private rights, its text must be 'phrased in terms of the persons benefitted.'" *Id.* at 284 (quoting *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692 n.13 (1979)). The Court also instructed that "[a] court's role in discerning whether personal rights exist in the § 1983 context should therefore not differ from its role in discerning

whether personal rights exist in the implied right of action context." *Id.* at 285. "Accordingly, where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action." *Id.* at 286.

2. Whether Mr. Long Has a Right Enforceable Under § 1983

The key preliminary question with respect to Count I of Mr. Long's Complaint, therefore, is whether Congress intended, through the cited provisions of the Housing Act, to create a new substantive individual right for participants in the Program, such as Mr. Long, against termination of their assistance on grounds that violate the statute and its implementing regulations.

Unfortunately, the parties' summary judgment briefing does not adequately address this crucial issue. Defendants address the issue to a limited extent, recognizing that, under *Gonzaga*, "[n]othing short of an unambiguously conferred right will support a cause of action under § 1983." Defs.' Mot. Summ. J. at 7. They also argue that, apart from the Housing Act's requirement that PHAs provide applicants with an opportunity to dispute the factual determination of their status as a lifetime registrant, "[t]here is no other rights-creating language in 42 U.S.C. § 13663." *Id.* at 10. Defendants do not, however, take this argument to its next logical step; they do not actually argue that they are entitled to summary judgment because Mr. Long cannot challenge the legal validity of his termination under § 1983. Instead, Defendants simply move on to merits of Mr. Long's claim. *See id.* at 10. Nor do they address the other statutory provisions that Mr. Long cites in his Complaint. Mr. Long, for his part, entirely ignores this issue in his briefing, focusing solely on the merits of his claim. *See* Pl.'s Mot. Summ. J. at 16–34; Pl.'s Reply Br. at 10–18, ECF No. 23. Surprisingly, Mr. Long does not even reference §

1983 anywhere in his briefing, despite the fact that it is the basis for the majority, if not all, of his claims.

The answer to this key question is not abundantly clear. The Court has been unable to locate any precedent in which a court has reached a reasoned determination as to whether Congress intended to create a substantive individual right for participants in the program against termination on grounds not authorized by the statute or its implementing regulations,[7] and courts have reached differing conclusions with respect to whether other portions of the Housing Act provide substantive individual rights enforceable under § 1983.

In *Wright v. Roanoke Redevelopment & Housing Authority*, 479 U.S. 418 (1987), a case decided before *Gonzaga*, the Supreme Court permitted a § 1983 suit brought by public housing tenants seeking recovery of past utility overcharges under a rent-ceiling provision of the Housing Act. In *Gonzaga*, the Court acknowledged *Wright* as one of only two instances since its prior decision in *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981), in which the Court had "found spending legislation to give rise to enforceable rights." *Gonzaga*, 536 U.S. at 280. The Court explained that the "key to [its] inquiry" in *Wright* was that "Congress spoke in terms that 'could not be clearer' and conferred entitlements 'sufficiently specific and definite to qualify as enforceable rights under *Pennhurst*.'" *Id.* (citations omitted) (quoting *Wright*, 479 U.S. at 430, 432). The Court stated that it was "[a]lso significant" in *Wright* "that the federal

---

[7]     The Court also observes that in the primary case relied upon by Mr. Long, the court explicitly left open the issue of the applicability of § 1983, as well as, with respect to the merits, "whether there are other statutory or regulatory justifications for the Defendants' termination of [the plaintiff's] Section 8 benefits." *Miller v. McCormick*, 605 F. Supp. 2d 296, 313 (D. Me. 2009). In the other federal case that Mr. Long relies on, the court does not appear to have considered the issue either. *See Perkins-Bey v. Housing Auth. of St. Louis Cnty.*, No. 4:11-cv-310, 2011 WL 939292, at *2 (E.D. Mo. Mar. 14, 2011); *see also Zimbelman v. S. Nev. Regional Housing Auth.*, 111 F. Supp. 3d 1148, 1154 (D. Nev. 2015) (assuming without deciding that the plaintiff had "the right to challenge the Housing Authority's substantive decision").

agency charged with administering the Public Housing Act 'ha[d] never provided a procedure by which tenants could complain to it about the alleged failures [of state welfare agencies] to abide by [the Act's rent-ceiling provision].'"  *Id.* (quoting *Wright*, 479 U.S. at 426) (alterations in original).

Since *Gonzaga*, federal courts have applied *Gonzaga* and *Wright* to other provisions of the Housing Act with differing outcomes.  For example, in *Johnson v. Housing Authority of Jefferson Parish*, the Fifth Circuit held that 42 U.S.C. § 1437f(o)(2), which concerns the calculation of the amount of the monthly assistance payment for a family in the Program, was "virtually identical" to the statute at issue in *Wright* and therefore created an individual right that could be enforced under § 1983.  *Johnson*, 442 F.3d at 360–67.  The court acknowledged, however, that its holding was "a rarity, particularly after *Gonzaga*."  *Id.* at 360.  At least some other courts, post-*Gonzaga*, have also applied *Wright* to other substantive provisions of the Housing Act.[8]  *See, e.g., Daniels v. Housing Auth. of Prince George's Cnty.*, 940 F. Supp. 2d 248, 259–63 (D. Md. 2013) (applying *Johnson* and *Wright* to 42 U.S.C. § 1437f(y), which concerns the "Homeownership Option" of the Program).

In other cases, courts have construed *Wright* narrowly and rejected arguments that other provisions of the Housing Act create substantive rights that can be enforced under § 1983.  For example, in a case decided long before *Gonzaga*, and shortly after *Wright*, the D.C. Circuit held that § 1437p of the Housing Act did not create "rights in public housing tenants against the constructive demolition of their units."  *Edwards v. District of Columbia*, 821 F.2d 651, 659–60 (D.C. Cir. 1987).  Most notably, in *Caswell v. City of Detroit Housing Commission*, 418 F.3d

---

[8]     As discussed, *infra*, courts have broadly agreed that certain provisions of the Housing Act and its implementing regulations provide procedural rights that are enforceable under § 1983.

615 (6th Cir. 2005), the Sixth Circuit considered, post-*Gonzaga*, a Program participant's claim

that his PHA violated 24 C.F.R. § 982.311(b), which requires PHAs to continue making

assistance payments to an owner until the owner obtains a court judgment allowing an owner to

evict the tenant, by terminating his assistance before his eviction proceeding was finalized in

state court.  *See id.* at 618.  The Sixth Circuit noted that the Supreme Court "made clear in

*Gonzaga* that where a statute simply prohibits certain conduct, or sets forth a policy, that statute

does not create a cause of action or other rights for the individual protected by the statute."  *Id.* at

619 (citing *Gonzaga*, 536 U.S. at 287–88).  The court concluded that it could find no provision in

the Housing Act that "in clear and unambiguous terms, confers a particular right upon the tenant

to subsidies after the landlord initiates eviction proceedings" and therefore held that the

participant could not pursue his claim under § 1983.  *Id.* at 620.  The Sixth Circuit has

subsequently held that neither 42 U.S.C. § 1437 nor § 1437f create an enforceable right to

"decent, safe, and sanitary housing," because, in part, "the language of § 1437f has an aggregate

focus on the entity being regulated."  *Johnson v. City of Detroit*, 446 F.3d 614, 625–27 (6th Cir.

2006).

　　　　Given this precedent, and particularly in light of the policy and public interest concerns

raised by both sides in this case, the Court believes that the issue of whether Congress intended,

through the cited provisions of the Housing Act, to create a new substantive individual right for

participants of the program, such as Mr. Long, against termination of their assistance on grounds

that violate the statute and its implementing regulations deserves a full briefing.  The Court will

therefore deny the parties' motions for summary judgment with respect to Count I without prejudice in order to permit the parties to refile their motions and address this important issue.[9]

### B.  Counts II & III:  Section 1983 Claims for Due Process Violations

In Count II, Mr. Long brings a § 1983 claim against Defendants for violating his right to procedural due process under the Fifth Amendment to the U.S. Constitution, and in Count III, Mr. Long brings a § 1983 claim for violating the Housing Act's procedural protections.  Given the significant overlap in the arguments concerning these counts, as well as the parties' treatment of the two counts together, *see* Defs.' Mot. Summ. J. at 8–10; Pl.'s Mot. Summ. J. at 34–37, the Court follows the parties' approach and considers the substance of those counts together.  Before

---

[9]     The Court would also appreciate clarity from the parties as to whether Mr. Long has any alternative means of challenging DCHA's decision, such as pursuant to the District of Columbia Administrative Procedure Act.  In addition, with respect to the merits of Count I, the Court suggests that the parties also address the following issues:

(1) whether the focus in 42 U.S.C. § 13662(a) on "owner[s]" and the language of 24 C.F.R. § 982.553(a)(2)(i) requiring PHAs to "establish standards that prohibit admission" of lifetime registrants, in contrast with the language of other provisions requiring PHAs to "prohibit admission" to other classes of applicants, *e.g.,* § 982.553(a)(1)(i), warrants any significance;

(2) the meaning of the provision in 24 C.F.R. § 982.552(a)(1) that "[t]he provisions of this section do not affect the denial or termination of assistance for grounds other than action or failure to act by the family" and how it applies to this case, including a discussion of the sorts of mandatory or permissive grounds for PHAs to terminate assistance "other than action or failure to act by a family" and the source or sources of that authority;

(3) whether the 2012 Notice falls within the category of "HUD requirements" as a "binding program directive[]" as described in 24 C.F.R. §§ 982.52(a) and 982.54(b);

(4) how a finding by the Court that 24 C.F.R. §§ 982.52(a) and 982.54(b) required DCHA to promulgate 14 D.C.M.R. § 5804.1(b) might affect the Court's analysis; and

(5) whether the fact that 14 D.C.M.R. § 5804.1(b) contains no reference to erroneously admitted participants and is not limited to participants admitted after June 25, 2001 should have any impact on the Court's analysis.

.

turning to the substance, however, the Court must separately address the legal basis for each claim.

    1.  Whether Mr. Long is Entitled to Constitutional and/or Statutory Due Process

    Before addressing the sufficiency of the process that Defendants afforded Mr. Long in terminating his assistance in the Program, the Court addresses the preliminary issue of whether Mr. Long is entitled to any due process at all under either the Fifth Amendment or the Housing Act itself.

    First, with respect to Mr. Long's constitutional due process claim, the Fifth Amendment provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. "The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property.'" *Gen Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010). "It is well established that certain government benefits give rise to property interests protected by the Due Process Clause." *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (citing *Goldberg v. Kelly*, 397 U.S. 254 (1970)). "To have a protected property interest in a given benefit, 'a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" *Id.* (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). The D.C. Circuit has defined a "legitimate claim of entitlement" to mean "that a person would be entitled to receive the government benefit *assuming* she satisfied the preconditions to obtaining it." *Id.*

    Here, the parties are in agreement that Mr. Long's participation in the Program constitutes a protected property interest. *See* Defs.' Mot. Summ. J. at 8; Pl.'s Mot. Summ. J. at 34. Indeed, the Court notes that some courts, including some in this district, have found that

once an individual becomes a participant in the Program, the person maintains a property interest

in continuing to receive assistance that is subject to constitutional due process protections.  *See*

*Robinson v. D.C. Housing Auth.*, 660 F. Supp. 2d 6, 20 (D.D.C. 2009) ("There is no debate that

the plaintiff's participation in the Section 8 program constitutes a property interest . . . .");

*Lowery v. D.C. Housing Auth.*, No. 04-1868, 2006 WL 666840, at *7 (D.D.C. Mar. 14, 2006)

("'It is uncontested' that a Participant in the Section 8 Program 'enjoys a property interest in

continued occupancy of the subsidized housing, and, further, that the interest constitutes a

statutory entitlement.  Accordingly, the protections of procedural due process apply.'" (quoting

*Nichols v. Landrieu*, No. 79-3094, 1980 U.S. Dist. LEXIS 17630, at *1 (D.D.C. Sept. 12,

1980))); *Davis v. Mansfield Metro. Housing Auth.*, 751 F.2d 180, 184 (6th Cir. 1984) (collecting

cases); *Simmons*, 716 F.2d at 1162–63 (holding that admission into the Program constitutes a

protected property interest, even if no benefits are actually received, because an admission

certificate "limits the power of a PHA to deny rent assistance to the family that holds it" and

"gives the family the right to continue participating in the program so long as the PHA lacks just

cause to expel it").

  With respect to Mr. Long's statutory due process claim, the § 1983 issue of whether the

cited provisions of the Housing Act and its regulations, 42 U.S.C. § 1437d(k) and 24 C.F.R. §

982.555(c)(2) afford Mr. Long an independent right to certain procedural requirements prior to

the termination of his assistance arises.  Here, however, Defendants concede that the statute

affords Mr. Long procedural protections.[10]  *See* Defs.' Mot. Summ. J. at 9.  Indeed, courts

---

[10] The Court observes that Defendants' concession appears to be in tension with their simultaneous position with respect to the merits of Count I that Mr. Long was "not . . . terminated because of a violation of the 'family obligations' set forth in 24 C.F.R. § 982.552 – he [was] terminated because he was erroneously admitted despite his ineligibility as a registered sex offender – and the regulations governing family obligations are not applicable."  Defs.' Opp'n

broadly agree that 42 U.S.C. § 1437d(k) and 24 C.F.R. § 982.555 give Program participants

certain procedural rights with respect to termination of their assistance that participants can

privately enforce through § 1983.  *See, e.g., Samuels v. District of Columbia*, 770 F.2d 184, 196–

98 (D.C. Cir. 1985) (holding, pre-*Gonzaga*, that § 1437d(k) "create[s] 'rights' enforceable under

section 1983"); *Lowery*, 2006 WL 666840, at *11 (permitting § 1983 claim under § 1437d(k) for

failing to provide the plaintiff with an informal hearing prior to terminating her from the

Program); *Stevenson*, 579 F. Supp. 2d at 923 (holding that "§ 1437d(k) creates enforceable rights

for [Program] participants" and that "individuals can seek redress when a public housing agency

fails to comply with termination procedures"); *Gammons v. Mass. Dep't of Housing & Cmty.*

*Dev.*, 523 F. Supp. 2d 76, 85 (D. Mass. 2007) (permitting § 1983 action challenging the

sufficiency of evidence used to terminate a plaintiff's assistance because § 1437d(k) "mandates

the creation of procedural rights for tenants faced with adverse action" and "[t]he language of the

statute unambiguously confers rights for the benefit of Section 8 subsidy recipients").

The Court will assume, without deciding, that Mr. Long's participation in the Program

provided him with a property interest protected by the Fifth Amendment's Due Process Clause

and that § 1437d(k) and 24 C.F.R. § 982.555 afforded him procedural rights in Defendants'

termination of his assistance.

---

Pl.'s Cross-Mot. Summ. J. & Reply Supp. Mot. Summ. J. at 14, ECF No. 21.  The relevant procedural protection requires PHAs to give "prompt written notice that the family may request a hearing" only in cases described in paragraphs (a)(1)(iv), (v) and (vi) of the same section.  *See* 24 C.F.R. § 982.555(c)(2).  Of those, the only conceivably applicable scenario is paragraph (iv), "[a] determination to terminate assistance for a participant family because of the family's action or failure to act (see § 982.552)."  24 C.F.R. § 982.555(a)(1)(iv).  Accepting Defendants' characterization of the basis for Mr. Long's termination therefore might conceivably lead to the conclusion that § 982.555 does not afford him *any* procedural protections.  Given the Court's approaches to Counts I and V, however, the Court need not take a position on that potential conflict here.

2.  Whether Mr. Long Received Sufficient Constitutional and Statutory Process

Given the Court's assumptions, the Court proceeds to the question of whether Mr. Long received process sufficient to satisfy the requirements of both the Due Process Clause of the Fifth Amendment and the statutory protections of 42 U.S.C. § 1437d(k) and 24 C.F.R. § 982.555(c)(2).

The Supreme Court set forth five requirements for terminating a participant's government assistance benefits in *Goldberg v. Kelly*, 397 U.S. 254 (1970):  (1) timely and adequate notice; (2) an opportunity to confront any adverse witnesses and present arguments and evidence; (3) retained counsel, if desired; (4) an impartial decision maker; (5) a decision resting on the legal rules and evidence adduced at the hearing; and (6) a statement of reasons for the decision and the evidence relied on.  *Id.* at 266–71.  Mr. Long takes the position that these rights are codified in 42 U.S.C. § 1437d(k) and its implementing regulations, which is consistent with Defendants' position.  *See* Pl.'s Mot. Summ. J. at 34; Defs.' Mot. Summ. J. at 9 ("These provisions essentially track the *Goldberg* due-process requirements."); *see also Clark v. Alexander*, 85 F.3d 146, 150–51 (4th Cir. 1996) ("Federal regulations set out the basic procedural requirements of informal hearings in almost literal compliance with *Goldberg*.").

Mr. Long does not contend that he was denied the second, third, and fourth requirements. Rather, he challenges only "the adequacy of Defendant Todman's decision overturning the hearing officer's 2014 decision in favor of Mr. Long" and "the 2014 notice indicating DCHA was terminating his [Program] benefits."  Pl.'s Reply at 7.  The Court addresses each challenge separately.

*a. Ms. Todman's Final Decision*

Mr. Long's first due process challenge is to Ms. Todman's decision reversing the decision of the informal hearing officer, arguing that her written decision was "woefully inadequate." Pl.'s Mot. Summ. J. at 35. In *Goldberg*, the Supreme Court explained:

> [T]he decisionmaker's conclusion as to a recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing. To demonstrate compliance with this elementary requirement, the decision maker should state the reasons for his determination and indicate the evidence he relied on, though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law.

*Goldberg*, 397 U.S. at 271 (internal citations omitted).

The parties also cite *Moore v. Ross*, 502 F. Supp. 543 (S.D.N.Y. 1980) for additional detail concerning the *Goldberg* requirement. In *Moore*, the court explained that the "major purposes" of the requirement were: "to protect against arbitrary and capricious decisions or actions grounded upon impermissible or erroneous considerations"; "to safeguard against a decision on *ex parte* evidence"; and "perhaps most importantly to facilitate judicial review by enabling a court to determine whether the decision was based upon an impermissible reason or no reason at all." *Moore*, 502 F. Supp. at 555–56 (internal quotations and citations omitted). The court further explained that "[w]hether a statement is sufficiently detailed and informative to comport with minimum due process depends on whether it satisfies the[se] purposes" and that, in an analogous context, "there is no infirmity in not referring specifically to the hearing examiner's findings, provided the . . . opinion makes it possible to infer why [it] rejected those findings." *Id.* at 556. Rather, "due process requires only a cognizable attempt to give an explanation." *Id.*

Likewise, while the implementing HUD regulations require hearing officers to issue a decision "stating briefly the reasons for the decision," 24 C.F.R. § 982.555(e)(6), the regulations only require a PHA that determines that it is not bound by a hearing officer's decision to

"promptly notify the family of the determination, and of the reasons for the determination," 24 C.F.R. § 982.555(f)(3).

Mr. Long's issues with Ms. Todman's final decision are two-fold.  First, he points to the decision's exclusive focus on the informal hearing officer's "misuse of the words 'ex post facto'" and claims that the decision failed to mention "the legal rules or evidence presented at the hearing."  Pl.'s Mot. Summ. J. at 35; *see also* Defs.' Ex. 6.  Second, he points to the decision's lack of discussion of the other purported grounds for the hearing officer's decision.  Pl.'s Mot. Summ. J. at 35–36; *see also* Defs.' Ex. 5 at 22; Defs.' Ex. 6.

Although Mr. Long's frustration with the brevity and lack of detail in Ms. Todman's final decision and his desire for DCHA to provide more thorough explanations when reversing decisions of hearing officers is understandable, the Court cannot find that Ms. Todman's decision fails to meet the bare minimum requirements of *Goldberg* and § 982.555.  Ms. Todman did, in fact, provide a legal basis for her decision by referencing and quoting 14 D.C.M.R. § 5804.1(b).  *See* Defs.' Ex. 6.  Given the clarity with which the regulation mandates termination and the fact that the informal hearing officer declared the regulation invalid based solely on his belief that it constituted an *ex post facto* law, Ms. Todman's rejection of the *ex post facto* analysis and quotation of the regulation sufficiently explained the basis for her decision and did not require analysis of the hearing officer's remaining grounds.  And while she did not reference any evidence adduced at the hearing, that omission is not fatal here, in which the essential fact that Mr. Long is a lifetime registrant and was one at the time he applied for admission to the Program has never been disputed.  Ms. Todman's decision thus represented "a cognizable attempt to give an explanation."  *Moore*, 502 F. Supp. at 556.

In addition, the decision appears to satisfy all of the purposes of the *Goldberg* requirement identified in *Moore*. The decision's citation to the relevant local regulation and explanation of Ms. Todman's rejection of the *ex post facto* analysis demonstrate that the decision was not arbitrary and capricious, and there is no suggestion that Ms. Todman relied on impermissible or erroneous considerations. Nor is there any indication that Ms. Todman relied on *ex parte* evidence. And, lastly, none of the decision's imperfections impair the ability of this court, or any other, from reviewing the decision, for, as Defendants observe, "[n]o party has had any apparent difficulty in determining the basis for Long's termination." Defs.' Opp'n Pl.'s Mot. Summ. J. & Reply Supp. Defs.' Mot. Summ. J. at 4 ("Defs.' Reply"), ECF No. 21.

Finally, and relatedly, the Court also observes that even to the extent that Ms. Todman's final decision could be considered to have fallen short of the constitutional and statutory due process requirements, Mr. Long does not explain how such a failure has harmed him or how or what injunctive relief—the only relief he seeks in this action—could cure that harm.

### b. The 2014 Termination Notice

Mr. Long's only other due process challenge is to the notice that DCHA sent him informing him of the recommendation to terminate his assistance. He argues that the notice violated 42 U.S.C. § 1437d(k) and 24 C.F.R. § 982.555, because it was "based on a misapplication of federal law" and "did not explain how Mr. Long had violated his 'family obligation' or engaged in 'criminal activity' through 'lifetime registration.'" Pl.'s Mot. Summ. J. at 36–37; *see also* Pl.'s Reply at 9 ("[T]he notice itself violates procedural due process because it failed to provide a valid legal basis for termination.").

The relevant regulation, however, is purely procedural. It simply provides, in relevant part, that the notice must contain a "brief statement of the reasons for the decision." 24 C.F.R. §

982.555(c)(2)(i).  The notice that Mr. Long received in 2014 clearly met this requirement, as it

cited and quoted 14 D.C.M.R. § 5804.1(b) and stated under its "Summary of Facts" that Mr.

Long had registered as a sex offender in December 2000.  *See* Defs.' Ex. 4.  Mr. Long's real

issue with the notice is not that it was *procedurally* deficient but that it was *substantively*

deficient, as even he acknowledges.  *See* Pl.'s Reply at 9 ("[P]laintiff's second procedural due

process claim simply speaks to the underlying issue in this case—that terminating Mr. Long on

the sole basis of his lifetime registrant status violates federal law.").  This might be grounds for

his separate § 1983 claim in Count I, but it is not a matter of procedural due process under either

the Fifth Amendment or the Housing Act.

Therefore, the Court finds that Defendants are entitled to summary judgment on the

entirety of Counts II and III.

## C.  Count IV:  Preclusion

In Count IV, Mr. Long argues that, under District of Columbia law, the doctrines of

preclusion, which he refers to as collateral estoppel and *res judicata*,[11] bar Defendants from

terminating his assistance, because an informal hearing officer previously ruled in 2007 that

DCHA could not terminate his assistance solely because of his status as a lifetime registrant.

As a preliminary matter, it is not entirely clear whether Mr. Long has a cause of action

for raising this argument.  The Complaint does not reference any statute or the common law as

the source for his cause of action, and the parties do not address the nature of the claim in their

---

[11]     The Court notes that, at least in federal court, the term *res judicata*, in modern parlance,
refers to both claim preclusion and issue preclusion.  *See generally Angelex Ltd. v. United States*,
--- F. Supp. 3d ----, No. 15-0056, 2015 WL 5011421 at *7 (D.D.C. Aug. 24, 2015).  In their
briefs, the parties utilize the traditional terminology, in which *res judicata* referred only to claim
preclusion and "collateral estoppel" referred to issue preclusion.  This usage appears consistent
with the practice of the District of Columbia Court of Appeals, *see, e.g., Borger Mgmt., Inc. v.
Sindram*, 886 A.2d 52, 59 (D.C. 2005), and the Court therefore uses that terminology here.

summary judgment briefing.  The Court is therefore unsure as to whether it should construe

Count IV as a distinct cause of action or falling within another enumerated cause of action.  No

matter how it is construed, however, to the extent that Mr. Long has a cause of action to

challenge the DCHA termination proceeding on preclusion grounds, it is without merit.

"The doctrine of collateral estoppel generally precludes the relitigation of factual or legal

issues decided in a previous proceeding and essential to the prior judgment." *Borger Mgmt., Inc.*

*v. Sindram*, 886 A.2d 52, 59 (D.C. 2005) (citing *Montana v. United States*, 440 U.S. 147, 153

(1979); *Oubre v. D.C. Dep't of Emp't Servs.*, 630 A.2d 699, 703 (D.C. 1993)).  The doctrine of

*res judicata*, by contrast, "precludes relitigation of the same claim between the parties." *Id.*

(citing *Oubre*, 630 A.2d at 703).  The D.C. Court of Appeals has held that "[b]oth of these

doctrines apply to the results of administrative proceedings 'when the agency is sitting in a

judicial capacity, resolving disputed issues of fact properly before it which the parties have an

adequate opportunity to litigate.'" *Id.* (quoting *Oubre*, 630 A.2d at 703).  The court "has

recognized, however, that in the field of administrative law *res judicata* is 'not encrusted with

the rigid finality that characterizes the precept in judicial proceedings.'" *Walden v. D.C. Dep't*

*Emp't Servs.*, 759 A.2d 186, 189 (D.C. 2000) (quoting *Oubre*, 630 A.2d at 703).

There is no doubt here that, during the informal hearing proceedings in 2007, DCHA's

informal hearing officer was sitting in a "judicial capacity," and therefore, the doctrines apply.

The Court thus addresses whether the 2007 decision is entitled to preclusive effect in this case.

### 1.  Collateral Estoppel

"Collateral estoppel . . . bars the re-litigation of issues determined in a prior action 'where

(1) the issue was actually litigated; (2) was determined by a valid, final judgment on the merits;

(3) after a full and fair opportunity for litigation by the party; [and] (4) under circumstances

where the determination was essential to the judgment.'" *DeWitt v. District of Columbia*, 43 A.3d 291, 300 (D.C. 2012) (quoting *Wilson v. Hart*, 829 A.2d 511, 514 (D.C. 2003)), *cert. denied*, 133 S. Ct. 449 (2012). "The burden is on the party asserting preclusion to show [an] actual decision of the specific issues involved." *Major v. Inner Cty. Prop. Mgmt., Inc.*, 653 A.2d 379, 382 (D.C. 1995).

An analysis of the first element is dispositive, because the issue involved in the 2007 proceeding differs from the issue presented here. "An issue is actually litigated when it 'is properly raised, by the pleadings or otherwise, and is submitted for determination, and is determined[.]'" *Ali Baba Co. v. WILCO, Inc.*, 482 A.2d 418, 422 (D.C. 1984) (quoting Restatement (Second) of Judgments § 27(d) (1982)); *see also Oubre*, 630 A.2d at 703 (stating that the issue must be "properly raised, considered on the merits, and determined").

Mr. Long argues that the issue in the 2007 proceeding was "whether DCHA could terminate" him. Pl.'s Mot. Summ. J. at 39. But that is far too broad of an interpretation and is contrary to the informal hearing officer's explicit identification of the issue presented. In his decision in 2007, the informal hearing officer stated that the issue presented was: "Whether the recommendation to terminate [Mr. Long] from the [Program] for violation of [24] C.F.R. § 982.553(a)(2)(i) is justified and supported by the facts." Defs.' Ex. 2 at 5. And his conclusion was that § 982.553(a)(2)(i) could not "be used to 'evict' an existing tenant from the program," adding that "[t]he Regulations, frankly, do not address the current circumstance." *Id.* at 7. He did not, as Mr. Long attempts to argue, rule on the issue of whether federal law *prohibited* DCHA from terminating Mr. Long's assistance, but, rather, he only found that the federal regulations did not provide it with the authority. In fact, he appears to have left open the

possibility that Mr. Long could still be terminated with "a more substantive showing that justifies otherwise." *Id.* at 9.

This is an important distinction, because, in this case, Defendants relied on a different purported grant of authority as their legal basis for terminating Mr. Long.  Here, Defendants have consistently taken the position that Mr. Long was not subject to termination pursuant to any provision of federal law, but, rather, pursuant to 14 D.C.M.R. § 5804.1(b).  *See, e.g.,* Defs.' Ex. 4 (2014 Notice citing 14 D.C.M.R. § 5804.1(b)); Defs.' Ex. 5 at 20 (informal hearing decision stating that the termination was recommended "based upon" 14 D.C.M.R. § 5804.1(b)); Defs.' Mot. Summ. J. at 20 ("It is the DCHA regulations, not the HUD regulations, that now provide the basis for Long's termination.").  Thus, the issue in this case is not whether DCHA can terminate Mr. Long pursuant to 24 C.F.R. § 982.553(a)(2)(i), as the informal hearing officer in 2007 already decided it could not and Defendants concede.  *See, e.g.,* Defs.' Mot. Summ. J. at 14 (stating that the statute and its implementing regulations are "silent on the specific issue here").  Rather, the issue is whether the basis for Mr. Long's termination in 2014, 14 D.C.M.R. § 5804.1(b), is valid.  That issue has never been decided, and, therefore, collateral estoppel is not applicable.

### 2.  *Res Judicata*

The doctrine of *res judicata* "bars relitigation of the same claim between the same parties" after a valid final adjudication on the merits.  *Oubre*, 630 A.2d at 703.  "*Res judicata* bars not only claims that were actually litigated in the first action but 'all issues arising out of the same cause of action' that could have been litigated."  *EDCare Mgmt., Inc. v. DeLisi*, 50 A.3d 448, 451 (D.C. 2012) (quoting *Faulkner v. Gov't Emps. Ins. Co.*, 618 A.2d 181, 183 (D.C.

1992)).  "If there is a common nucleus of facts, then the actions arise out of the same cause of action."  *Patton v. Klein*, 746 A.2d 866, 870 (D.C. 1999).

The doctrine of *res judicata* did not bar Defendants from terminating Mr. Long in 2014. The two claims were plainly different:  in 2007, DCHA sought to terminate Mr. Long pursuant to HUD regulations regarding the admission of lifetime registrants, and in 2014, DCHA sought to terminate him pursuant to District of Columbia regulations regarding termination of lifetime registrants.  Though the two actions arose under the same common nucleus of facts—namely, Mr. Long's status as a lifetime registrant—the claim in 2014 could not have been litigated in 2007, because 14 D.C.M.R. § 5804.1(b) was not in existence at the time.

Accordingly, Defendants are entitled to summary judgment on Count IV.

### D.  Count V:  Violation of 14 D.C.M.R. § 5804.4

Count V, Mr. Long's final claim, is that Defendants violated 14 D.C.M.R. § 5804.4, which provides:  "DCHA has the burden of proving that a Family violated one or more of its obligations by a preponderance of the evidence."  Unfortunately, this count is also inadequately briefed by the parties.[12]

Similar to Counts I and IV, the parties fail to address the threshold issue of whether Mr. Long may bring a claim in federal court challenging DCHA's compliance with its own regulations.  Moreover, even if the Court could proceed to the merits of the claim, its resolution would likely turn on the answer to several key considerations involved in the merits of Count I, such as whether DCHA's termination of Mr. Long should be interpreted as a termination for a

---

[12]  Defendants fail to even address Count V in their motion for summary judgment, and only respond to Mr. Long's arguments on this count in a footnote in their joint opposition and reply brief, without citing the provision at issue or acknowledging the issue as a separate count of the Complaint.  See Defs.' Reply at 5 n.1.

violation of his obligations and whether, and to what extent, DCHA may terminate a participant for grounds other than a violation of family obligations.

Given the inadequate briefing and the extent to which the issues involved in this count appear to be inextricably bound to the merits of Count I, the Court finds that it is appropriate to deny summary judgment on Count V to all parties without prejudice so that these issues may be more fully developed in subsequent briefing together with Count I.

## V.  CONCLUSION

For the foregoing reasons, the Court will **GRANT IN PART AND DENY IN PART** Defendants' motion for summary judgment (ECF No. 16) and **DENY** Plaintiff's motion for summary judgment (ECF No. 18).  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  February 29, 2016                                         RUDOLPH CONTRERAS
                                                                 United States District Judge